No. 65,605

GARY ANDERSON, BARBARA ANDERSON, DOUGLAS STEWART, JEAN-
NIE LARKINS, MIKE TETLEY, JIM THOMAS, PAM TETLEY, and
DONNA STEWART, *Appellees*, v. HEARTLAND OIL & GAS, INC.,
ROBERT YOUNG, and GEORGE JONES, *Appellants*.

(819 P.2d 1192)

 Opinion
filed October 25, 1991. 

*James D. Harty*, of McPherson, argued the cause, and *Dale M. Sprague*, of the same firm, was with him on the briefs for appellants.

*Michael A. Montoya* and *Patrik M. Neustrom*, of Achterberg, Neustrom & Montoya, of Salina, argued the cause and were on the brief for appellees.

The opinion of the court was delivered by

LOCKETT, J.: This was an action brought by eight plaintiffs, five of whom were not residents of Kansas, to recover the purchase monies paid for units in an Oklahoma oil and gas well and to rescind certain agreements executed in Colorado. Plaintiffs claimed they were fraudulently induced to enter into the agreements by nonresident officers of the Kansas corporation. At the conclusion of the trial, the trial court instructed the jury on an additional theory of fraud not raised in the plaintiffs' petition or at pretrial, *i.e.*, fraudulent promise of future events. The jury found that the defendants had committed fraud. The trial court rescinded the contracts, granted money judgments for the purchase money, and awarded prejudgment and postjudgment interest. Defendants appeal, claiming: (1) The trial court did not have personal jurisdiction over nonresident corporate officers of a Kansas corporation; (2) there was insufficient evidence for the corporation to be held liable for the actions of its corporate officers; (3) the trial court erred in instructing the jury on fraudulent promise of future events; (4) the trial court erred in refusing to separate the theories of fraud in the verdict form to show which theory the jury applied to each defendant; and (5) the trial court erred in failing to grant the defendants' motions for directed verdicts after the evidence had been submitted.

Appellants' and appellees' statements of facts consist of disjointed facts rather than a concise and complete statement of facts as required by Supreme Court Rule 6.02(d) (1990 Kan. Ct. R. Annot. 25) and Rule 6.03(c) (1990 Kan. Ct. R. Annot. 26). The facts we recite are sufficient to determine the issues present in the appeal.

The action by the eight plaintiffs arose after Douglas Stewart purchased one unit of the production interest in the Earl Trenton No. 1 oil and gas well, located in Grant County, Oklahoma for

$5,700 from Heartland Oil & Gas, Inc., in June of 1988. It is necessary to set out the plaintiffs, the defendants, the relationship between the parties, and how Stewart's original purchase resulted in this action.

Plaintiffs Douglas Stewart, Gary Anderson, and Jim Thomas worked for the same company. Donna Stewart and Douglas Stewart are mother and son. Gary and Barbara Anderson are husband and wife. Barbara Anderson and Mike Tetley are brother and sister. Mike Tetley and Pam Tetley are husband and wife. Jim Thomas was Jeannie Larkins' boyfriend. Douglas Stewart, Jim Thomas, and Jeannie Larkins were residents of Colorado at the time of their purchases. Donna Stewart and the Andersons were residents of Kansas. The Tetleys were residents of New Jersey.

Defendant Heartland Oil and Gas, Inc., is a Kansas corporation with Gypsum, Saline County, Kansas, designated as the location of its principal office and registered agent. Defendant George Jones was Chairman of the Board of Directors, Chief Executive Officer, and Vice-President of Marketing for Heartland Oil and Gas, Inc. Jones owns, controls, or has an interest in 57$^{1}/_{2}$% of the corporation's stock, is a resident of Colorado, and lists his home in Colorado as an out-of-state office of the Kansas corporation. Defendant Robert Young is Vice-President of Marketing for Heartland Oil and Gas, Inc., and owns or controls approximately 7$^{1}/_{2}$% of the corporate stock. Young is also a resident of Colorado, and lists his home in Colorado as an out-of-state office of the Kansas corporation.

After Douglas Stewart purchased his original unit from the corporation in June of 1988, he sold $^{1}/_{2}$ of the unit to the Andersons for $2,850. The original purchase by Stewart and the sale to the Andersons started a chain of purchases of the production interests in the Earl Trenton No. 1 well when Douglas Stewart and the Andersons were informed that their original investment would reap them a fortune. By this time, because the well had been completed, was being tested, and was producing, the purchase price had risen to $7,500 per $^{1}/_{2}$ unit. The plaintiffs were informed that in the near future production interest in the well would increase to $10,000 per $^{1}/_{2}$ unit. Based on information provided by Young, the Andersons purchased an additional $^{1}/_{2}$ unit; Donna Stewart purchased $^{1}/_{2}$ unit; Douglas Stewart pur-

chased ¹/₂ unit; the Tetleys purchased ¹/₂ unit; and Jim Thomas and Jeannie Larkins purchased 1¹/₂ units in the oil well together. Jim Thomas' name, however, did not appear on the agreements.

The trial transcript in this case is 800 pages. The appellants and appellees failed to adequately identify which statements by Young were misrepresentations and how these statements differed from the facts existing at the time of the statements. Neither the appellants' nor the appellees' brief properly identifies the testimony relating to the alleged misrepresentations made by Young to each of the various plaintiffs. The following summarizes the testimony of the plaintiffs as to statements made by Young.

Young informed the plaintiffs the oil was there and they were buying oil that had already been "hit." Young advised the plaintiffs that the pipe was set, there was an 18-foot Misener zone, and oil was flowing and the well was producing in excess of 1,000 barrels a day. The oil well was going to produce 800-1,000 barrels of oil per day for 5-7 years and contained over a million cubic feet of natural gas. The risk for those who invested was over. Young supplied figures from initial production maps of other wells in the area which indicated that up to 1,572 barrels of oil were being produced by other wells in the area each day. Young did not inform the plaintiffs there were limitations to production of oil from wells in Oklahoma. (In fact, there is a 250 barrel per day per well limit.) Young stated the well was worth millions of dollars. Young informed the plaintiffs there was no risk, absolutely nothing could go wrong, their initial investment would be returned within 60 days, their fortune was reconfirmed, and they could add a million dollars to their financial statements. Thomas testified Young ran the figures on his calculator at the Colorado meeting three of the plaintiffs attended. Before the well was plugged, its highest production was 42 barrels of oil per day.

Defendant Young testified he did not solicit any of the plaintiffs as investors in the well. At a meeting in Denver he told Douglas Stewart, Jim Thomas, and Jeannie Larkins that there was less risk now than at the beginning of the well project. Young gave Douglas Stewart, Thomas, and Larkins a prospectus at the meeting in Denver, and they received the well log from Jones at the meeting on the 9th of August. Young denied telling the plaintiffs the well was an 800-1,000 barrel producer or that there was an

18-foot Misener zone. Young testified oil actually spewed over the top of the derrick during the drill stem test on August 4, 1988. Young denied making the statements the Tetleys and Thomas alleged or telling Donna Stewart the well was in production or the number of barrels of oil the well was producing. Young testified that, when he talked with each of the plaintiffs, they understood he was a salesperson who represented Heartland Oil. Young testified the plaintiffs had contacted him about buying into the well. Young stated he did not initiate contact with any of the plaintiffs or solicit the plaintiffs to purchase units in the Earl Trenton No. 1.

The various purchases were made as follows: After a sales pitch by Young in a restaurant in Denver, Colorado, on August 9, 1988, Douglas Stewart, Larkins, and Thomas met Young and Jones and purchased interests in the well. There is conflicting testimony as to whether there were two or three meetings at the restaurant. Young attended all of the meetings. Jones, who attended only one meeting, never made a statement to the plaintiffs. Jones' purpose in being at the meeting was to bring the well logs for Douglas Stewart, Larkins, and Thomas to review. There is conflicting testimony whether he actually brought the well logs.

Donna Stewart's ½ unit was purchased by her through her son, Douglas Stewart. Donna Stewart wrote a check to Heartland Oil Inc., for her ½ unit and mailed the check from Kansas to her son in Colorado. Douglas gave his mother's check to Young in Colorado. Donna Stewart's only contact with Young was by telephone from Kansas to Young in Colorado. Donna Stewart received all her information about the Earl Trenton No. 1 from her son, Douglas Stewart.

The Andersons, in Kansas, telephoned Young in Colorado to inquire about the ½ unit they had previously purchased from Douglas Stewart. The parties discussed the advantages of purchasing additional units in the well. The Andersons mailed checks to Young to purchase a second ½ unit.

The Tetleys were informed of the possibility of investing in the Earl Trenton No. 1 by the Andersons. Pam Tetley telephoned from New Jersey to Young in Colorado. Pam Tetley sent a check from New Jersey to Young in Colorado. Young mailed a transfer

agreement and a lease agreement to the Tetleys in New Jersey. Mike Tetley never had contact with Young. His information about the Earl Trenton No. 1 came from the Andersons and his wife.

Plaintiffs claim that, in addition to giving false information about the well, Young deceived them by failing to inform them they were purchasing the non-operator interests from him, not the corporation. Although the "Oil and Gas Non-Operator Production Interest Transfer Agreements" and "Oil and Gas Lease Operation Agreements" signed by the individual plaintiffs were entitled "Heartland Oil & Gas", the units purchased by plaintiffs were owned by Young, not Heartland. Young signed the transfer agreements as the individual who owned the units.

After the plaintiffs executed the transfer agreements with Young, they were required to sign oil and gas lease operation agreements with the corporation. This added to the plaintiffs' confusion. The operation agreements stated in part:

"Heartland Oil & Gas Inc.
909 Maple—P.O.Box 346
Gypsum, Ks. 67448
(913) 536-4816

"OIL AND GAS
LEASE OPERATION AGREEMENT
"For consideration hereby acknowledged the parties hereto being Heartland Oil & Gas Inc., and/or its assigns, hereinafter referred to as Heartland or Operator and Gary Anderson referred to as Non-Operator, do hereby agree as follows:
"1. INTEREST SOLD: Pursuant to the terms hereof Heartland does hereby agree to sell to Non-Operator One units, subject to a ⅛ royalty interest, and a ⅛ overriding interest, subject to a fifty percent revisionary [sic] interest after payout, in and to oil and gas leases and leasehold estate thereby established covering the following described premises:
"EARL TRENTON #1 SW SW NE QUARTER OF SECTION 8-26N-7W GRANT COUNTY, OKLAHOMA—40 ACRES"

The lease operation agreement with Heartland Oil & Gas, Inc. was signed

"Heartland Oil & Gas, Inc.
By Robert Young, V.P.
signature of officer/title"

Whether the individual plaintiffs knew they were purchasing units personally owned by Young rather than by Heartland Oil was a disputed fact. Although the language of the transfer agree-

ments indicated a sale of units by Young rather than Heartland Oil and Gas, Inc., the jury determined Young's deception caused the plaintiffs to believe they were purchasing their non-operator interests from Heartland.

Near the end of the trial, defendants moved for directed verdicts against all plaintiffs. Their motion for directed verdict against plaintiff Thomas was granted because he had not signed the agreements.

After the jury found each of the defendants had committed fraud, the trial judge determined that the Andersons, the Tetleys, and Donna Stewart had not been fraudulently induced to enter into the agreements by Jones' silence at the Denver meetings and granted Jones' motion for directed verdict as to those plaintiffs. Based on the finding by the jury, the trial court rescinded both the transfer and operation agreements and granted money judgments equal to the purchase price of each ½ unit purchased, plus prejudgment and postjudgment interest. All three defendants were held jointly and severally liable for the money judgments of Douglas Stewart and Larkins. Young and Heartland Oil and Gas, Inc., were held jointly and severally liable for the remaining money judgments. The defendants appealed.

## PERSONAL JURISDICTION OVER THE DEFENDANTS JONES AND YOUNG

Defendants Jones and Young contend, except for the claims of the plaintiffs who were residents of Kansas, the trial court could not acquire personal jurisdiction over them under K.S.A.1990 Supp. 60-308, the Kansas long arm statute. At the time the fraudulent acts occurred three of the plaintiffs were Kansas residents, two plaintiffs were New Jersey residents, and three plaintiffs were Colorado residents. Defendants Young and Jones were Colorado residents, and defendant Heartland Oil and Gas, Inc., was a Kansas corporation.

Prior to trial, Jones moved to dismiss the action against him, claiming the trial court lacked in personam jurisdiction over him under 60-308(b). The trial court found there was personal jurisdiction of Jones under 60-308(b)(6), stating:

"Certainly 'acting within this state' taken in context does not mean the tortious act or specific business transaction must take place in Kansas. It

means while an individual is serving in the capacity of an officer, manager, etc. of a Kansas corporation there is a sufficient nexus to warrant an assertion of jurisdiction over that individual as well as the corporation so long as jurisdiction is grounded upon the individual acting as a representative of the corporation."

Additionally, without explanation, the trial court found that basic notions of due process were not offended by its assertion of in personam jurisdiction over Jones. The trial court's reference to "tortious act or specific business transaction" appears to be referencing sections (b)(1) and (b)(2) of the long arm statute.

On appeal, both defendants contend the trial court erred in holding it had personal jurisdiction over nonresident corporate officers under 60-308(b)(6). Defendants rely on *Schlatter v. Mo-Comm Futures, Ltd.*, 233 Kan. 324, 662 P.2d 553 (1983), where we determined two of the nonresident directors of a Missouri corporation were not subject to in personam jurisdiction under 60-308(b)(6). In *Schlatter* all of the Missouri corporate directors were nonresidents of Kansas. Two of the defendants were nominal directors of the Missouri corporation, who were not involved in directing the Missouri corporation's business or did not participate in the fraudulent sale of limited partnership shares in Kansas. We held that the phrase "acting within this state," (60-308[b][6]) requires something more than a failure to act on the part of a nonresident director of a Missouri corporation. We noted if the legislature had intended that mere membership on the board of directors (of an out of state corporation) was sufficient to subject a corporate director to Kansas jurisdiction for tortious acts of the corporation, it could easily have said so.

K.S.A. 1990 Supp. 60-308(b) states, in part:

"(b) *Submitting to jurisdiction—process.* Any person, whether or not a citizen or resident of this state, who in person or through an agent or instrumentality does any of the acts hereinafter enumerated, thereby submits the person and, if an individual, the individual's personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of these acts:

"(1) Transaction of any business within this state;

"(2) commission of a tortious act within this state;

. . . .

"(5) entering into an express or implied contract, by mail or otherwise, with a resident of this state to be performed in whole or in part by either party in this state;

"(6) acting within this state as director, manager, trustee or other officer of any corporation organized under the laws of or having a place of business within this state or acting as executor or administrator of any estate within this state."

The Kansas long arm statute, K.S.A. 1990 Supp. 60-308, is liberally construed to assert personal jurisdiction over nonresident defendants to the full extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution. *Ling v. Jan's Liquors*, 237 Kan. 629, 633, 703 P.2d 731 (1985). When the existence of personal jurisdiction is controverted, plaintiff has the minimal burden of establishing a prima facie threshold showing that constitutional and statutory requirements for the assumption of personal jurisdiction are met. *Ammon v. Kaplow*, 468 F. Supp. 1304, 1309 (D. Kan. 1979).

"The Due Process Clause of the Fourteenth Amendment limits the power of a state court to render a valid personal judgment against a nonresident defendant. [Citation omitted.] . . . Due process requires that the defendant be given adequate notice of the suit, [citation omitted], and be subject to the personal jurisdiction of the court [citation omitted] . . . .

". . . [A] state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum State. [Citation omitted.] The concept of minimum contacts . . . protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.

. . . .

"Thus, the Due Process Clause 'does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations.' [Citation omitted.] Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation . . . .

. . . .

". . . '[F]oreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause.

. . . .

"This is not to say, of course, that foreseeability is wholly irrelevant. But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. [Citations omitted.] The Due Process Clause, by ensuring the 'orderly

administration of the laws,' [citation omitted], gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-97, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980).

The rights and obligations attached to membership in a foreign corporation, as well as in any other corporation, are contractual in nature, yet the act of becoming a stockholder or member of such a corporation is regarded as something more than a contract, involving the relationship between the stockholder or member and the corporation, which must be governed by the law of the state granting the incorporation. Therefore, residents of one state, by becoming stockholders of a corporation incorporated under the laws of another state, submit themselves to that extent to the jurisdiction and laws of the latter state. See 36 Am. Jur. 2d, Foreign Corporations § 431 and cases cited therein.

"In order to subject a defendant to a judgment *in personam* if he be not present within the territory of the forum state, he must have the minimum contacts enumerated in the statute, and whether due process is satisfied depends upon the quality and nature of the activities of the defendant, which must be determined on a case by case basis." *White v. Goldthwaite*, 204 Kan. 83, Syl. ¶ 2, 460 P.2d 578 (1969).

"Three basic factors must coincide if jurisdiction is to be entertained over a nonresident on the basis of transaction of business within the state. These are (1) the nonresident must purposefully do some act or consummate some transaction in the forum state; (2) the claim for relief must arise from, or be connected with, such act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation." *White v. Goldthwaite*, 204 Kan. 83, Syl. ¶ 3.

Doing business in a state supplies the minimum contact required for a nonresident to be subject to personal jurisdiction under our long arm statute. " 'Business' is transacted within the state when an individual is within or enters this state in person or by agent and, through dealing with another within the state, effectuates or attempts to effectuate a purpose to improve his economic conditions and satisfy his desires." *Woodring v. Hall*, 200 Kan. 597, 607, 438 P.2d 135 (1968). The transaction of busi-

ness exists when the nonresident purposefully does some act or consummates some transaction in the forum state. *White v. Goldthwaite,* 204 Kan. at 88.

"A private corporation is an association of persons to whom the state has offered a franchise to become an artificial, juridical person, with a name of its own, under which they can act and contract, and sue and be sued." *Mackay v. New York, H.H. & H. R. Co.,* 82 Conn. 73, 81, 72 A. 583 (1909). Every corporation created under the Kansas statutes can sue or be sued "in all courts and participate, as a party or otherwise, in any judicial, administrative, arbitrative or other proceeding, in its corporate name." K.S.A. 17-6102(2). The business and affairs of every Kansas corporation are to be managed "by or under the direction of the board of directors." K.S.A. 17-6301(a).

K.S.A. 1990 Supp. 60-308(b) reflects a conscientious state policy to assert jurisdiction over nonresident defendants to the extent permitted by the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. Membership by a nonresident upon the board of directors of a corporation organized under the laws of or having a place of business within Kansas subjects such a director to in personam jurisdiction in Kansas under 60-308(b)(6). Although the defendants Young and Jones were Colorado residents, they were corporate directors and officers of a Kansas corporation. Jurisdiction over individual officers, directors and employees of a domestic corporation, for claims that may result in personal liability, is predicated merely upon jurisdiction over the corporation itself.

Jones contends that, if the trial court had personal jurisdiction over him, he nevertheless is protected by the fiduciary shield doctrine. Jones quotes *Wilshire Oil Company of Texas v. Riffe,* 409 F.2d 1277, 1281 n. 8 (D. Kan. 1969):

"It has been held that while a foreign corporation is amenable to service when it transacts business through agents operating in the forum state, unless the agents transact business on their own account and not on behalf of the corporation, the agents are not engaged in business so as to sustain an application of the long arm statute to them as individuals."

We disagree with Jones' analysis. The fiduciary shield doctrine is not applicable to a domestic corporation or its agents conducting corporate business in or out of the state of incorporation.

## WAS THERE SUFFICIENT EVIDENCE, AS A MATTER OF LAW, TO HOLD THE CORPORATION LIABLE FOR THE ACTIONS OF ITS AGENTS?

Heartland Oil asserts for it to be responsible for the the actions of Jones or Young, its responsibility must be based on a recognized theory of agency law holding the principal liable. We agree with that statement.

"Generally, a corporation is bound by the acts of its duly authorized officers or agents acting within the scope of their authority." *Executive Financial Services, Inc. v. Loyd*, 238 Kan. 663, Syl. ¶ 2, 715 P.2d 376 (1986). A corporation is also liable for the torts of its agents when committed within the scope of its agents' authority and course of employment even though it did not authorize or ratify the tortious acts. *Kline v. Multi-Media Cablevision, Inc.*, 233 Kan. 988, 666 P.2d 711 (1983).

"When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal." *Wisker v. Hart*, 244 Kan. 36, 37, 766 P.2d 168 (1988).

Here, there was sufficient evidence of acts of fraud by the officers or agents of the corporation to support the verdict against Heartland.

## DID THE TRIAL COURT ABUSE ITS DISCRETION BY INCLUDING A CAUSE OF ACTION FOR FRAUDULENT PROMISE OF FUTURE EVENTS?

Defendants next contend the trial court (1) abused its discretion by amending the petition to include a cause of action for fraudulent promise of future events and (2) erred by instructing the jury on that issue. The tort of fraudulent promise of future events is defined as a promise made which the promisor had no intent of performing when made, made with the intent to deceive and to induce the promisee to act upon said promise, reasonable reliance on the promise by the promisee, and ultimate failure to perform by the promisor. PIK Civ. 2d 14.41.

K.S.A. 60-215(b) states:

"*Amendments to conform to the evidence*. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

The trial judge did not state he was amending the petition, but said he would instruct the jury on fraudulent promise of future events.

A trial judge is given broad discretionary power to amend the pleadings, and the exercise of such discretion will not constitute reversible error unless it affirmatively appears that the amendment allowed or denied is so material it affects the substantial rights of the adverse party. *Ballhorst v. Haner-Foreman-Cale, Inc.*, 207 Kan. 89, 92, 484 P.2d 38 (1971). In *Simonich, Executrix v. Wilt*, 197 Kan. 417, 417 P.2d 139 (1966), the executrix of an estate brought an action claiming money in a joint tenancy bank account in the names of the decedent and defendant was an asset of the decedent's estate. During the trial, the trial judge injected equitable issues on his own motion without a request by the executrix to amend her petition pursuant to K.S.A. 60-215(b). We noted that the trial judge had abused his discretion by injecting equitable issues into the case which were completely outside of the pleadings and the evidence. 197 Kan. at 424-25.

"It is the duty of the trial court to properly instruct the jury upon the theory of the case. Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct, and the jury could not reasonably be misled by them, the instructions will be approved on appeal." *Trout v. Koss Constr. Co.*, 240 Kan. 86, 88-89, 727 P.2d 450 (1986).

Defendants do not identify the prejudice to them that directly resulted from the giving of the instruction on fraudulent promise of future events. Apparently, their claim is that the case was not tried on that theory and that it was prejudicial to them to allow the jury the opportunity to consider an additional theory of fraud even though fraud was alleged in the plaintiffs' petition and the pretrial order. We disagree.

We have read the instructions, the instructions are substantially correct, and there is evidence to support a finding the defendant made a fraudulent promise of a future event. The plaintiffs' action is based on fraud, and the additional issue of fraudulent promise of future events is so similar to the fraud claim that no surprise occurred.

## DID THE TRIAL COURT ERR BY NOT ITEMIZING THE DIFFERENT THEORIES OF FRAUD ON THE VERDICT FORM TO SHOW WHICH THEORY WAS APPLICABLE TO EACH DEFENDANT?

Defendants requested the trial judge to submit special questions to the jury in its verdict form. Defendants contend the trial court erred by denying defendants' request to amend the verdict form so that the jurors were required to make a separate finding of which theory of fraud applied to each defendant. Defendants argue that lumping the different fraud theories into one finding on the verdict form deny them and the appellate courts the ability to determine which theory of fraud was applied to a particular defendant by the jury. Defendants also argue that not itemizing the different theories of fraud on the verdict form essentially instructed the jury a defendant could be found liable on any theory.

A judge may require the jury to make special written findings as to each issue of fact. K.S.A. 60-249. "The decision to submit special interrogatories to the jury rests within the sound discretion of the trial judge and will not be disturbed on appeal absent the showing of abuse of discretion." *Schaeffer v. Kansas Dept. of Transportation*, 227 Kan. 509, 520, 608 P.2d 1308 (1980). See *Hoffman v. Haug*, 242 Kan. 867, 873, 752 P.2d 124 (1988).

Submission of a special verdict form may often assist the trial judge in the burden of submitting the law of the case by com-

plicated instructions. Whether to submit a special verdict form or instruct the jury on the law and how it applies to each count against each defendant is within the sound discretion of the trial judge. We have reviewed the verdict form and the instructions submitted to the jury, and we find the trial judge properly instructed the jury as to the law and to the application of each theory of fraud against a particular defendant. The trial judge did not abuse his discretion in refusing to submit a special verdict form to the jury.

## DID THE TRIAL COURT ERR BY NOT GRANTING THE DEFENDANTS' MOTION FOR A DIRECTED VERDICT AS TO EACH OF THE PLAINTIFFS' CLAIMS?

Defendants' last contention is the trial court erred by not granting their motion for directed verdict as to all of plaintiffs' claims. Defendants assert (1) the representations the plaintiffs claimed were fraudulent were not of current fact and (2) there was insufficient evidence of reliance to support a finding of fraud.

"When ruling on a motion for directed verdict, both the trial court and the appellate court are required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where reasonable minds could differ on the evidence, the motion must be denied and the case submitted to the jury." *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 60, 755 P.2d 1319 (1988).

The trial judge granted the motion as to certain plaintiffs and claims, but not all of the claims.

It is not necessary that we repeat all of the facts. After considering all facts and inferences reasonably to be drawn from the evidence in favor of the plaintiffs, we find that the trial court did not err in denying the defendants' motions for directed verdict.

Affirmed.